UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ZOOM TAN, INC.,

                                   Plaintiff,

         v.                             **COMPLAINT**

95 NYRPT, LLC,

                                   Defendant.

Plaintiff, Zoom Tan, Inc. ("Zoom Tan" or "Plaintiff"), by and through its attorneys, Harris Beach PLLC, for its Complaint against Defendant 95 NYRPT, LLC ("Defendant"), sets forth and alleges as follows:

## **THE PARTIES**

1.      Plaintiff is a corporation incorporated under the laws of Florida, with its principal place of business at 8625 Tamiami Trail North, City of Naples, County of Collier, State of Florida.

2.      Pursuant to 28 U.S.C. § 1332(c)(1), Plaintiff is a citizen of the State of Florida.

3.      Upon information and belief, Defendant is a limited liability company organized under the laws of New York, with its principal place of business located at 570 Delaware Avenue, City of Buffalo, County of Erie, State of New York.

4.      Upon information and belief, each of Defendant's members are, if corporate entities, incorporated in states other than the State of Florida and have their principal places of business in a state or states other than the State of Florida and, if natural persons, have their domiciles in a state or states other than the State of Florida.  Therefore, pursuant to 28 U.S.C. § 1332(c)(1), Defendant is not a citizen of the State of Florida.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1), based upon complete diversity of citizenship between Plaintiff and Defendant and because the amount in controversy exceeds $75,000, exclusive of interests and costs.

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the real property that is the subject of this action is located in the Western District of New York.

## BACKGROUND

7.      Pursuant to a Lease dated September 27, 2019 ("Lease Agreement"), a copy of which is attached as **Exhibit A**, Zoom Tan leased from Defendant approximately 1,507 square feet of space (20 feet 7 inches of frontage and 78 feet of depth), at 4770 Transit Road #200, Depew, New York, 14043 ("Leased Premises").  The Leased Premises is located in a shopping plaza known as Transit and French Plaza (the "Shopping Center").

8.      Under the Lease Agreement, Zoom Tan leased the Leased Premises for the operation of a tanning salon and the incidental sale of related products (*see* Lease Agreement, § 2).

9.      The term of the Lease Agreement is five (5) years or until June 30, 2024 ("Lease Term") (Lease Agreement, at p. 1).

10.      Pursuant to the Lease Agreement, Zoom Tan agreed to pay base rent in the amount of $40,689 (or $27.00 per square foot) per annum for the Leased Premises during the Lease Term (Lease Agreement, § 1).

11.      Zoom Tan also agreed to pay in monthly installments together with base rent additional rent for common area maintenance and insurance costs (Lease Agreement, § 23). Additional rent is calculated annually and, for the first (partial) year of the Lease Term, the rate

was $4.25 per square foot of the Leased Premises.  The additional rent rate increases 3% per year on January 1 of each subsequent year.  In addition, Zoom Tan agreed to pay as additional rent its proportionate share of real property taxes and assessments which for the first (partial) year of the Lease Term, the rate was $2.98 per square foot of the Leased Premises (Lease Agreement, § 30).

12.     Zoom Tan offers two types of tanning units which require minimum room sizes of either 5 x 7 feet or 8 x 8 feet.  These size parameters and the configuration of the Leased Premises to maximize the number of tanning rooms are a primary consideration when Zoom Tan selects space for a new Zoom Tan location.

13.     The number of tanning rooms that would fit within the Leased Premises was one of the most important factors in Zoom Tan entering into the lease, as the space would permit a total of twelve (12) tanning rooms.

14.     Costs associated with just the buildout of the Leased Premises in order to house Zoom Tan's operations, which were at Zoom Tan's sole cost and expense pursuant to Section 46 of the Lease Agreement, totaled approximately $135,480.

15.     Costs associated with furnishing and other start up operating costs to commence Zoom Tan's operations, which were at Zoom Tan's sole cost and expense, totaled approximately $20,000.

16.     Zoom Tan commenced operations at the Leased Premises on April 19, 2021.

17.     Pursuant to Section 51 of the Lease, Zoom Tan "shall have the option of renewing th[e] Lease for an additional term of five (5) years . . . upon the same terms and conditions except for a new annual rental of $44,75.90," provided Zoom Tan is not in default of the Lease Agreement and gives notice of its election of the option at least 180 days before expiration of the Lease Term (Lease Agreement, § 51[A]).

3

18.     The dispute between the parties herein centers upon Section 3 of the Lease Agreement, which states in pertinent part:

> . . . Lessor reserves the right to enlarge or diminish store sizes (other than the Demised Premises) and to construct additional buildings on the site of which the Demised Premises are a part, provided such alterations will not interfere with Lessee's use of the Demised Premises as set forth in Paragraph 2 above. **Lessor may elect to cause Lessee to relocate its business, at Lessor's cost, within ninety (90) days after notice to do so, to another location within the Shopping Center, comparable in size, access and visibility to the Demised Premises.** Lessor and Lessee shall execute and deliver an amendment to this Lease which shall substitute the new location for the Demised Premises described herein and shall modify the rents and additional charges hereunder based upon the square footage of the new location, if different from the Demised Premises; otherwise all of the terms and conditions of this Lease shall be applicable to the new premises. If Lessor and Lessee cannot agree on a new location within sixty (60) days after notice of exercise by Lessor of its relocation option, then Lessor may elect to withdraw its notice requiring Lessee to relocate in which case Lessee shall, at Lessor's option, remain in possession of the Demised Premises, or if Lessor shall not withdraw its request then this Lease shall terminate at the end of such ninety (90) day period. Notwithstanding anything contained herein to the contrary, Lessor shall not relocate Lessee during the months of January through June of any year.

(Lease Agreement, § 3).

19.     By letter dated April 8, 2022, a copy of which is attached hereto as **Exhibit B**, which is approximately one year after Zoom Tan opened its operations at the Leased Premises, Defendant notified Zoom Tan of Defendant's election to relocate the Leased Premises to the area in the Shopping Center labelled "New Space" on the map enclosed therewith ("Relocation Notice").

20.     The New Space is not "comparable in size, access and visibility to the [Leased] Premises" (*see* Lease Agreement, § 3).

21.     The New Space is only 1,077 square feet and is thus approximately 33% smaller than the Leased Premises (1,507 square feet).

22.     The New Space has a frontage of only 17 feet, and is thus approximately 17% more narrow than the frontage of the Leased Premise (20 feet 7 inches).

23.     The New Space has a depth of 63.36 feet, and is thus approximately 19% less deep than the Leased Premises (78 feet).

24.     In order for the more narrow, less deep New Space to accommodate Zoom Tan's 5 x 7 feet rooms, their longer walls would need to run perpendicular to, not parallel with, the store front.  This reconfiguration, coupled with the decrease in depth, would require three (3) rooms to be eliminated from the space.  Thus, the smaller dimensions of the New Space alone would require a reduction in UV tanning rooms from the current twelve (12) rooms to nine (9) rooms.

25.     There is also a structural column in the center of the New Space.  This obstacle would require a reduction of 1-2 additional UV tanning rooms to maintain a sufficient access route in compliance with requirements of the Americans with Disabilities Act.  If two rooms are lost, this would cause a 41.7% reduction in revenue generating UV tanning rooms.

26.     Furthermore, the number of UV tanning rooms would need to be reduced even more in the New Space for there to be space to permit a mop sink, which is critical to the Zoom Tan's business operations.  Assuming that, at a minimum, there will be a loss of one additional UV tanning room, that would cause a 50.0% reduction in revenue-generating UV tanning rooms. That outcome is unjust because Zoom Tan had to spend over $155,000 to build out, furnish and commence operations just one year before Defendant requested Zoom Tan to relocate its business to a non-comparable location in the Shopping Center.

27.     Due to a materially smaller store front, Zoom Tan would need to substantially decrease the size of its signage, leading to extra costs and reduced visibility from the street.

28.     The reduction in space and addition of obstacles posed by the configuration of the New Space would make it impossible for Zoom Tan to undertake operations on a scale remotely comparable to its current operations at the Leased Premises.

29.     Given Zoom Tan's membership-based business model, a reduction in 50.0% of the UV tanning rooms would result in a loss of revenue equal to or greater than 50.0% of the revenue presently generated in the Leased Premises.

30.     Lastly, although Defendant is required to pay relocations and buildout costs, it did not specifically offer to pay those and, to date, as more fully discussed below, it has actually refused and continues to refuse to pay those costs.

31.     The Relocation Notice is void *ab initio* and is invalid and unenforceable.

32.     Zoom Tan responded to Defendant to say the space was not comparable.  However, in the interest of working with Defendant despite its unreasonable relocation demand, Zoom Tan agreed to look for alternative spaces in other shopping centers operated by Defendant or its affiliates.

33.     By email dated June 2, 2022, Defendant acknowledged Zoom Tan's objection to the New Space and set forth its refusal to take that into consideration of its unreasonable relocation demand.

34.     By letter dated July 15, 2022, a copy of which is attached hereto as **Exhibit C**, Defendant notified Zoom Tan of Defendant's purported election to terminate the Lease Agreement pursuant to Section 3 thereof, effective September 15, 2022, on the basis that the parties "have not agreed on a new location for the [Leased] Premises" in response to the Relocation Notice ("Termination Notice").

35.     Upon information and belief, the reason Defendant desires for Zoom Tan to relocate to the New Space is so that the Leased Premises can be added to the space currently leased by an existing tenant of the Shopping Plaza (Starbucks).

36.     The Termination Notice is void *ab initio* and is invalid and unenforceable.

37.     Zoom Tan nevertheless thereafter engaged in discussions with Defendant about a potential agreement between the parties whereby Zoom Tan would agree to relocate to the New Space in consideration of Defendant's agreement to: pay for and complete the buildout of the New Space; excuse Zoom Tan from paying rent for the buildout period; provide storage space for Zoom Tan's equipment during the buildout; and decrease Zoom Tan's rent commensurate with the reduced size of the leased space.  All of the aforementioned are rights afforded to Zoom Tan under the Lease Agreement in the event of a forced relocation.

38.     Zoom Tan and Defendant participated in discussions in November 2022 to go over the prospect of Zoom Tan voluntarily relocating to the New Space.

39.     During those discussions, Defendant stated it had no authority to agree to the conditions proposed by Zoom Tan.  Defendant also confirmed that it already has entered into a revised lease with Starbucks which incorporates the square footage associated with the Leased Premises.

40.     Defendant has taken the incorrect position that it has the right to terminate the Lease Agreement and that if Zoom Tan agrees to a relocate to the New Space it no longer has to pay for Defendant's relocation costs based on a purported failure to agree to relocate to the non-comparable New Space within ninety (90) days of the Relocation Request.  Defendant is wrong on both accounts.

41.     Zoom Tan continues to occupy the Leased Premises and has continued to make the rental payments required of it under the Lease Agreement since the termination date contained in the Termination Notice (September 15, 2022), all of which payments Defendant has accepted.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

42.    Plaintiff repeats and re-alleges its allegations contained in the preceding paragraphs as if set forth fully herein.

43.    An actual and justiciable controversy exists between the parties regarding whether the Relocation Notice is valid and/or enforceable under the parties' Lease Agreement, where the New Space is not "comparable in size, access and visibility to the [Leased] Premises" (*see* Lease Agreement, § 3).

44.    An actual and justiciable controversy also exists between the parties regarding whether the subsequent Termination Notice is valid and/or enforceable and, in turn, whether the Lease Agreement remains in full force and effect and, particularly, whether Plaintiff is entitled to remain in occupancy of the Leased Premises, notwithstanding Defendant's issuance of the Termination Notice.

45.    The foregoing controversies are actual controversies within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201, and thus are subject to judicial determination by the Court.

46.    Further acts by Defendant that treat the Termination Notice as valid and enforceable will cause Plaintiff to damage its operations, suffer reputational harm, damage its good will, and damage customer relations.

47.    Plaintiff has no adequate remedy at law.

48.    By reason of the foregoing, Plaintiff therefore seeks: a declaration that the Relocation Notice is void *ab initio*, is unenforceable as against Zoom Tan, and constitutes an invalid exercise by Defendant of the relocation option contained in Section 3 of the Lease Agreement.

8

49.     Plaintiff also seeks a declaration that the Termination Notice, which was issued based on a void and unenforceable Relocation Notice, is void *ab initio*, and that the Lease Agreement therefore remains in full force and effect and Plaintiff is accordingly entitled to remain in occupancy of the Leased Premises pursuant to the terms of the Lease Agreement.

50.     Plaintiff accordingly seeks an Order preliminary and permanently enjoining and restraining Defendant from undertaking any actions that treat the Lease Agreement as terminated by virtue of the Termination Notice, including but not limited to any measures to remove Plaintiff and/or Plaintiff's personal property from the Leased Premises.

51.     By reason of the foregoing, and only in the event that the Court declares that the Relocation Notice is valid, Plaintiff seeks, in the alternative, an order directing that service of notice of entry of an order containing the Court's declaration to that effect shall trigger the sixty (60) day period for the parties to execute and deliver an amendment to the Lease Agreement contemplated by Section 3 of the Lease Agreement (specifically, substituting the New Space for the Leased Premises, and modifying the rents and additional charges under the Lease Agreement, based upon the square footage of the New Space and requiring Defendant to pay for the relocation and buildout costs of the New Space in addition to other costs).

52.     The amount in controversy with regard to the declaratory relief sought herein totals at least $350,000, exclusive of interest and costs, which amount includes, at a minimum, the value of Plaintiff's investment in the buildout of the Leased Premises (approximately $135,480), the value of the opening costs of the Leased Premises (approximately $25,000), the value of base rent and additional rent for the remainder of the Lease Term (approximately $76,000), and the value of the base rent and additional rent associated with the  five-year renewal Lease Term (approximately $224,000 and $38,000, respectively).

## SECOND CAUSE OF ACTION
### (Anticipatory Repudiation – in the alternative)

53.     Plaintiff repeats and re-alleges its allegations contained in the preceding paragraphs as if set forth fully herein.

54.     Plaintiff and Defendant entered into a contract for the lease of the Leased Premises pursuant to the Lease Agreement.

55.     Upon information and belief, the Lease Agreement constitutes a valid and enforceable contract between the Parties.

56.     Plaintiff has substantially performed in accordance with the terms of the Lease Agreement.

57.     Plaintiff is ready, willing, and able to perform its obligations under the terms of the Lease Agreement until the end of the term stated therein.

58.     Plaintiff is ready, willing, and able to exercise its option to renew the Lease Agreement for an additional term of five (5) years, pursuant to the terms stated therein.

59.     Upon information and belief, Defendant has unequivocally stated that it has breached, or will further breach the Lease Agreement by acting on the invalid Removal Notice and/or Termination Notice, and leasing the Leased Premises, already leased to Plaintiff, to a third party.

60.     As a direct result of Defendant's breaches, Plaintiff will be damaged by, among other things, the loss of its investment in the buildout of the Leased Premises, loss of the benefit of the Lease Agreement's terms governing rent for both the remainder of the Lease Term and the optional renewal term which Plaintiff is ready, willing, and able to avail itself of, loss of revenue associated with the disruption to its business operations, losses associated with damage to its business reputation, and costs associated with securing alternate space for its business operations

in lieu of the Leased Premises, including but not limited to brokerage fees, attorneys' fees, storage fees and buildout expenses.

## THIRD CAUSE OF ACTION
### (Attorneys' Fees)

61.    Plaintiff repeats and re-alleges its allegations contained in the preceding paragraphs as if set forth fully herein.

62.    Pursuant to Section 49 of the Lease Agreement, Plaintiff is entitled to recover its costs, including reasonable attorneys' fees, incurred as a result of the successful enforcement of its rights under the Lease Agreement.

WHEREFORE, Plaintiff Zoom Tan, Inc., demands judgment as follows:

A.    On the First Cause of Action, a declaration that the Relocation and Termination Notices are void *ab initio*, and an Order preliminarily and permanently enjoining and restraining Defendant from acting upon those notices; or, in the alternative, a declaration that Defendant must pay for buildout and relocation costs associated with the New Space and otherwise comply with all relocation conditions set forth in the Lease, including without limitation reducing the rent based on the smaller square footage associated with the New Space;

B.    On the Second Cause of Action, damages in an amount to be determined at trial;

C.    On the Third Cause of Action, an award of Attorneys' Fees incurred as a result of Defendant's actions requiring enforcement of Plaintiff's rights under the Lease Agreement; and

D.    Such other and further relief as the Court may deem just and proper.

Dated:  November 30, 2022
       Pittsford, New York

**HARRIS BEACH PLLC**

By:  James P. Nonkes, Esq.
*Attorneys for Plaintiff*
99 Garnsey Road
Pittsford, New York 14534
Telephone: (585) 419-8800
jnonkes@harrisbeach.com